## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHRISTOPHER L. IVEY, | Civil No. 05-2666 (JRT/FLN) |
| Plaintiff, | |
| v. | **ORDER ADOPTING REPORT AND RECOMMENDATION AND AFFIRMING ORDER OF THE MAGISTRATE JUDGE** |
| DEAN MOONEY, individually and in his official capacity as Director of the Minnesota Sex Offender Program; and CAL LUDEMAN, | |
| Defendants. | |

Christopher L. Ivey, 1111 Highway 73, Moose Lake, MN 55767-9452, plaintiff *pro se*.

Carrie A. Oberg and Robin Christopher Vue-Benson, Assistant Attorneys General, **OFFICE OF THE MINNESOTA ATTORNEY GENERAL**, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for defendants.

This case is before the Court on plaintiff Christopher L. Ivey's objections to a Report and Recommendation issued by United States Magistrate Judge Franklin L. Noel on August 18, 2008 and an Order issued by Magistrate Judge Noel dated August 18, 2008. After a *de novo* review of the objections to the Report and Recommendation, *see* 28 U.S.C. § 636(b)(1); Local Rule 72.2(b), and clear-error review of the Order, *see* 28 U.S.C. § 636(b)(1); Local Rule 72.2(a), the Court adopts the Report and Recommendation and affirms the Order for the reasons given below.

## BACKGROUND

In 1993, the Minnesota Legislature enacted legislation to establish a secure facility for sex offenders in Moose Lake, Minnesota. *See* Minn. Stat. § 246B.02. There is also a Minnesota Sex Offender Program ("MSOP" or "the Program") secure facility in St. Peter, Minnesota. The Program provides treatment to persons committed by the courts as sexual psychopathic personalities or sexually dangerous persons under the Minnesota Commitment and Treatment Act. *See* Minn. Stat. § 246B.02; Minn. Stat. ch. 253B. "Sexual psychopathic personalities" are persons whose conduct evidences an utter lack of power to control their sexual impulses. Minn. Stat. § 253B.02, subd. 18b. "Sexually dangerous persons" are persons who, because of their history and condition, are likely to engage in acts of harmful sexual conduct. Minn. Stat. § 253B.02, subd. 18c.

In 2004, the Minnesota Legislature enacted Minnesota Statute section 246B.04, subdivision 2, entitled "Ban on Obscene Material or Pornographic Work." Section 246B.04, subdivision 2 provides:

> **Ban on obscene material or pornographic work.** The Commissioner shall prohibit persons civilly committed as sexual psychopathic personalities or sexually dangerous persons . . . from having or receiving material that is obscene as defined under section 617.241, subdivision 1,[1]

---

[1] Minnesota Statute section 617.241, subdivision 1(a) provides:

"Obscene" means that the work, taken as a whole, appeals to the prurient interest in sex and depicts or describes in a patently offensive manner sexual conduct and which, taken as a whole, does not have serious literary, artistic, political, or scientific value. In order to determine that a work is obscene, the trier of fact must find:

(i) that the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest in sex;

(ii) that the work depicts sexual conduct specifically defined by clause (b) in a patently offensive manner; and

(Footnote continued on next page.)

material that depicts sexual conduct as defined under section 617.241, subdivision 1,[2] or pornographic work as defined under section 617.246, subdivision 1,[3] while receiving services in any secure treatment facilities

---

(Footnote continued.)

    (iii) that the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

[2] Minnesota Statute section 617.241, subdivision 1(b) provides:

    "Sexual conduct" means any of the following:

    (i) An act of sexual intercourse, normal or perverted, actual or simulated, including genital-genital, anal-genital, or oral-genital intercourse, whether between human beings or between a human being and an animal.

    (ii) Sadomasochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a sexually revealing costume or the condition of being fettered, bound, or otherwise physically restricted on the part of one so clothed or who is nude.

    (iii) Masturbation, excretory functions, or lewd exhibitions of the genitals including any explicit, close-up representation of a human genital organ.

    (iv) Physical contact or simulated physical contact with the clothed or unclothed pubic areas or buttocks of a human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification.

[3] Minnesota Statute section 617.246, subdivision 1(f) provides:

    "Pornographic work" means:

    (1) an original or reproduction of a picture, film, photograph, negative, slide, videotape, videodisc, or drawing of a sexual performance involving a minor; or

    (2) any visual depiction, including any photograph, film, video, picture, drawing, negative, slide, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means that:

        (i) uses a minor to depict actual or simulated sexual conduct;

        (ii) has been created, adapted, or modified to appear that an identifiable minor is engaging in sexual conduct; or

(Footnote continued on next page.)

operated by the Minnesota sex offender program or any other facilities operated by the commissioner.

In November 2004, the MSOP distributed a procedure entitled "Ban on Sexually Explicit, Obscene or Pornographic Materials" ("the 2004 Ban") that was created in order to comply with Section 246B.04, subdivision 2. (Mooney Aff. ¶7.) The 2004 Ban was the subject of litigation brought by another patient of the MSOP, Clark A. Kruger. (*Id.* ¶8.) After two attorneys were appointed to represent Kruger,[4] he pursued claims that are substantially similar to those pursued here.

Kruger ultimately settled his claims. As part of that settlement, the 2004 Ban was superseded by a policy titled "Media Possession By Patients in the Minnesota Sex Offender Program" ("the 2007 Policy"). The 2007 Policy was negotiated over the course of seventeen months, and incorporated suggestions from Kruger's attorneys. (*Id.* ¶10.) The purpose of the 2007 Policy is to provide a

> therapeutic living environment for patients in the [MSOP] that enhances their rehabilitation, to provide a safe and secure environment for all persons in MSOP facilities, and to comply with the provisions of Minnesota Statutes section 246B.04, subdivision 2 by restricting patients from possessing sexually explicit, obscene or pornographic materials in a way that is consistent with the constitutional rights of civilly-committed patients.

(*Id.*, Ex. 1.) The 2007 Policy goes on to state that

---

(Footnote continued.)

    (iii) is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexual conduct.

[4] Specifically, Kruger was represented by Professor Eric Janus, now President and Dean of the William Mitchell College of Law, and Robin Wolpert of the firm Greene Espel, PLLP. (*See Kruger v. Goodno*, Civ. No. 05-2078 (D. Minn.).)

> [c]ivilly committed patients retain their First Amendment rights, unless those rights are restricted for important and specified treatment or safety reasons. . . . There is reasonable concern that some sexually explicit materials, which are otherwise legal, can increase the likelihood of assaultive or harassing behavior among committed patients. These materials may also hinder a patient's rehabilitation.

(*Id.*)

The 2007 Policy divides all media material into one of three categories: prohibited, counter-therapeutic, and permitted. (*Id.*) Prohibited materials may not be possessed by any patient and are defined as:

1. Obscene materials, as defined in Minnesota Statutes section 617.241.

2. Illegal materials, such as those containing child pornography as defined in Minnesota Statutes section 617.246.

3. Any pictures, including pictures in reading materials, or videos of full or partially nude minor children with clearly visible genitals.

4. Any pictures, including pictures in reading materials, or videos of the unclothed or clothed figure of a minor child posing in a sexually suggestive posture or sexual manner.

5. Movies rated "NC-17" or "X."

6. Video games with an Entertainment Software Rating Board ("ESRB") rating of "AO."

7. Any pictures, including pictures in reading materials, or videos showing close-up depictions of

   a. sexual intercourse, including any type of vaginal, oral or anal penetration;

   b. human genitalia in a lewd and explicit fashion;

   c. masturbation;

   d. excretory functions;

   e. sexual relations between a human being and an animal; or

   f. sadomasochistic abuse.

8. Pictures, videos or reading materials that, taken as a whole, promote sexual violence, child molestation, or incest or that, taken as a whole,

-5-

        predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines such as *Playboy*, *Penthouse* and *Hustler*.

9. Pictures of the patient's victims.

10. Otherwise permitted materials of the type that the patient has misused in the past, providing that the restriction is proportionate to the misuse.

(*Id.*)

Materials are designated as counter-therapeutic if they (1) "have been determined for articulated reasons, by the Media Review Team, under the supervision of a competent mental health professional, to reinforce a problem area related to the sexual offending cycle of the patient who possesses or seeks to possess the materials"; or if they (2) depict "nudity, sexual contact, sadomasochistic abuse, masturbation or excretory functions" but were not categorized as prohibited, <u>and</u> "have been determined for articulated reasons, by a competent mental health professional, to be counter-therapeutic either to a) the patient who possesses the material, or b) a large number of patients in the Program." (*Id.*) Any material that has not been designated as either prohibited or counter-therapeutic is designated as permitted. (*Id.*) Movies rated "G," "PG," or "PG-13," and video games with an ESRB rating of "EC," "E," E10+," or "T" are designated as permitted material without any review by the MSOP staff. (*Id.*) Movies rated "R" and video games with an ESRB rating of "M" or "RP" must be reviewed by the MSOP staff to determine the appropriate classification, which is then compiled into a published list for other patients. (*Id.*)

The Kruger Settlement requires MSOP staff to apply the 2007 Policy, rather than the statutory language of section 246B.04, subdivision 2, in determining whether materials are allowed or prohibited. (Mooney Aff. ¶15.)

Ivey is committed to the MSOP facility in St. Peter, Minnesota, as a sexually psychopathic personality and a sexually dangerous person.[5] Shortly after Ivey's arrival at the MSOP, multiple images from his computer were seized pursuant to the 2004 Ban. After the Kruger Settlement and the implementation of the 2007 Policy, the images that were seized were reviewed under the new policy. Of the 143 seized images, 127 images were returned to Ivey and 16 were designated as prohibited material. (Sixth Ivey Aff., Docket No. 97, ¶¶6-9.) MSOP informed Ivey that the images that were prohibited depicted (1) oral sex; (2) sexual intercourse; or (3) nude or "bare breasted women" depicted "with the primary purpose of sexual arousal." (*Id.* ¶11.)

Ivey originally brought this action on November 11, 2005, alleging that Minnesota Statute section 246B.04, subdivision 2 – both on its face and as applied – violates the First Amendment of the United States Constitution.[6] Following several years of pretrial proceedings, the Kruger Settlement, and the MSOP's adoption and implementation of the 2007 Policy, both parties filed motions for summary judgment. The Magistrate Judge now recommends that defendants' motion be granted and Ivey's motion be denied.

---

[5] *See In re Ivey*, 687 N.W.2d 666, 667 (Minn. Ct. App. 2004). In 1993, Ivey pleaded guilty to first-degree burglary, first- and second-degree criminal sexual conduct, and "other offenses." *Id.* Ivey also "confessed to many acts of window peeping and burglary, and additionally confessed to the 1989 murder and attempted rape of a young woman in Stuttgart, Germany." *Id.*

[6] Ivey initially brought additional claims, but has stipulated to their dismissal. (See Docket No. 73.)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II. MSOP'S RESTRICTIONS

#### A. Limits of Ivey's Facial Challenge to Section 246B.04

In considering the scope of Ivey's claim, the Magistrate Judge concluded that Ivey could not challenge aspects of Minnesota Statute section 246B.04, subdivision 2 that are not embodied in the 2007 Policy. Specifically, this means that Ivey would not be permitted to mount a facial challenge against the definitions articulated in Minnesota Statute section 617.241, subdivision 1, which are incorporated by reference into section 246B.04. The Magistrate Judge reasoned that because subdivision 2 is now enforced pursuant to the 2007 Policy, any broader challenge would amount to a "pre-enforcement" challenge. "Even in the First Amendment context, such a challenge presents a justiciable controversy only if the probability of enforcement is real and substantial." *Amatel v.*

*Reno*, 156 F.3d 192, 195 (D.C. Cir. 1998) (internal quotation marks omitted).  The Magistrate Judge concluded that Ivey could not meet that burden as a matter of law, because the 2007 Policy was established as the operative standard in the Kruger Settlement.

Ivey now objects to that conclusion, arguing that subdivision 2 uses the term "shall," and therefore prohibits MSOP from changing its terms.  However, even where state actors are subject to non-waivable requirements, a "realistic assessment of the likelihood of [enforcement] is a necessary part of the threshold inquiry concerning justiciability."  *Salvation Army v. Dep't of Cmty. Affairs of State of N.J.*, 919 F.2d 183, 192 (3d Cir. 1990).  "Where the plaintiff seeks a declaratory judgment with respect to the constitutionality of a state statute, even where the attack is on First Amendment grounds, there must be a real and immediate threat of enforcement against the plaintiff."  *Id.* (internal quotation marks omitted).  "Moreover, this threat must remain real and immediate throughout the course of the litigation."  *Id.* (internal quotation marks omitted).  Here, the terms of the settlement of the Kruger litigation removed any "real and immediate" threat that subdivision 2 – unmediated by the 2007 Policy – would be enforced against Ivey.  Accordingly, the Court agrees with the Magistrate Judge, and concludes that Ivey lacks standing to challenge aspects of subdivision 2 that are not embodied in the 2007 Policy.

**B. 2007 Policy**

**1. Applicable Standard**

The Magistrate Judge analyzed the 2007 Policy using a modified version of a test announced in *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner*, the Supreme Court sought to "formulate a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights." *Id*. at 85 (alteration in original) (internal quotation marks omitted). The Court announced that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 89. Here, Ivey is of course not a prisoner, which takes his case beyond the specific holding in *Turner*. The Eighth Circuit, however, has indicated that those who are civilly committed as dangerous persons have limited rights as well. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). While they are entitled to "more considerate treatment and conditions of confinement" than prisoners, their "liberty interests are considerably less than those held by members of free society." *Id*. (internal quotation marks omitted). Because Ivey has been civilly committed as a sexually dangerous person, the Magistrate Judge concluded that the appropriate standard to apply to Ivey's claim is a version of the *Turner* test, moderated to account for the principles stated in *Senty-Haugen*.

The Court agrees that this standard is an appropriate standard to apply to Ivey's claim, on the basis of the reasoning set forth by the Magistrate Judge. This Court only adds that in explaining its approach in *Turner*, the Supreme Court noted that a prisoner "retains those [constitutional] rights **that are not inconsistent with his status as a**

-10-

**prisoner** or with the legitimate penological objectives of the corrections system." 482 U.S. at 95 (internal quotation marks omitted) (emphasis added). Here, as is discussed more fully below, MSOP has provided evidence that access to certain pornographic materials can trigger relapse among its patients, or otherwise hinder its rehabilitative efforts. In short, there is a clear conflict between (1) maintaining an institution directed to rehabilitate sexually dangerous persons and (2) permitting those persons to enjoy unfettered access to materials that may impede that rehabilitation. That conflict further supports the application of the deferential test outlined in *Turner*.[7]

### 2. MSOP's 2007 Policy

*Turner* instructs courts to examine four factors when determining whether the regulation at issue withstands scrutiny:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon

---

[7] Ivey briefly contends that this test should not apply, because the limitations at issue are ultimately grounded in a statute. In *Amatel v. Reno*, 156 F.3d 192, 195 (D.C. Cir. 1998), however, the District of Columbia Circuit applied *Turner* in a First Amendment case, where – as here – a limiting statute was implemented through prison regulations. This is consistent with the fact that the interests outlined in *Turner* itself – including the security and resource concerns inherent in custodial settings – are implicated regardless of whether an institution's rules are set entirely by the institution's administrators or whether they implement a statute.

The Court adds, however, that it need not decide whether a modified version of the *Turner* test would apply in *every* claim involving the constitutional rights of the civilly committed. That test is appropriate here in large part because of the close fit between the particular constitutional right at issue and MSOP's rehabilitative mission. However, a civil commitment is significantly different from a criminal conviction. Most importantly, an individual must not be civilly committed for the purpose of imposing punishment, and the fact of commitment is not a basis for any punitive measures during the course of the individual's treatment. Those principles should be kept close at hand in cases concerning the constitutional rights of civilly committed sex offenders.

others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 (8th Cir. 2004). The burden of proof in cases governed by *Turner* falls on the plaintiff. *See Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir. 1991).

In adapting and applying the *Turner* factors, the Magistrate Judge considered whether MSOP's 2007 Policy is reasonably related to legitimate institutional and therapeutic interests. The Magistrate Judge concluded that the Policy meets this standard. The Magistrate Judge first agreed with defendants that the policy furthers two legitimate goals: "1) to create and maintain an atmosphere that is conducive to the therapeutic goals of treating Minnesota's most dangerous and compulsive sex offenders; and 2) to reduce the danger of sexual aggression toward other civilly committed patients or staff members." (Report and Recommendation at 9-10.) Ivey concedes that these are legitimate interests.

In determining that the 2007 Policy bears a rational relationship to those goals, the Magistrate Judge relied extensively on an affidavit from Elizabeth Barbo, Ph.D, LP, MSOP's director of psychological services. (Barbo Aff.) In particular, the Magistrate Judge relied on the following statements from Dr. Barbo: (1) avoidance of situations that may trigger a relapse is a crucial aspect of MSOP's therapeutic program; (2) sexually arousing material may trigger a relapse among certain patients; (3) sexually graphic material cannot be allowed on an individual basis, because patients often sell or trade materials to other patients; and (4) increased exposure to sexually explicit materials is not consistent with Ivey's rehabilitation attempts. (*Id*. at ¶¶13, 18, 21, 30.) Dr. Barbo

supported her conclusions with several scholarly articles indicating that pornography is associated with sexual aggression, particularly in men with a history of that behavior. (Barbo Aff. Exs. 1-3.) In light of those views, the Magistrate Judge concluded that the 2007 Policy bears a "logical and rational" relationship to the goals articulated above.

The Magistrate Judge further concluded that Ivey has adequate alternative means of accessing materials of a sexual nature. The Magistrate Judge noted that the 2007 Policy does not ban all nudity, but rather excludes the limited categories quoted above. In addition, the Magistrate Judge noted that the materials returned to Ivey demonstrated that he had been allowed to retain pictures of a sexual nature. (Sixth Ivey Aff. Ex. 2.) Finally, the Magistrate Judge indicated that allowing additional materials would negatively impact the institution, by enabling the sort of trading among patients noted above, and that the 2007 Policy – which, again, was negotiated over the course of seventeen months following an earlier lawsuit – is not an exaggerated response to the MSOP's therapeutic needs.

Ivey objects to that analysis, arguing that the 2007 Policy fails to precisely define its parameters and "overreaches into much healthy, protected, non-conduct nudity." The Court disagrees that these are adequate challenges to the Policy under *Turner*. As to the specificity of the 2007 Policy, the Policy includes ten numbered clauses that carefully describe the banned material, as well as specific guidelines for classifying materials as counter-therapeutic. While those provisions do not make it absolutely clear what MSOP's decision will be in each and every case, the nature of the subject matter would make that nearly impossible. In light of the varying histories and therapeutic needs of MSOP's patients, sorting through what should be allowed and what should not – without

implementing a blanket prohibition that would eviscerate the patients' rights altogether – is inherently an imprecise and fact-specific task. In those circumstances, the Court agrees that MSOP – in conjunction with the negotiation team that constructed the Kruger Settlement – has established well-supported parameters that are reasonably related to its legitimate therapeutic and institutional interests.

As to the application of the 2007 Policy, the Court again agrees that Ivey has failed to supply sufficient evidence of a constitutional violation. As the Magistrate Judge noted, the record contains pictures that have been returned to Ivey as allowed under the Policy. (*See* Sixth Ivey Aff. Ex. 2.) Those pictures indicate that Ivey has continued to receive access to materials of a sexual nature, and do not demonstrate an unconstitutional departure from the Policy considered above. In sum, the Court agrees with the Magistrate Judge that Ivey has failed to supply sufficient evidence that the 2007 Policy – either on its face or as applied – violates his constitutional rights as a civilly committed, sexually dangerous person.[8] Accordingly, the Report and Recommendation of the Magistrate Judge is adopted.

---

[8] Ivey briefly adds that further discovery should be allowed as to MSOP's implementation of the 2007 Policy. However, as noted above, the record already includes evidence as to how that Policy was applied to Ivey. Ivey does not address what any further discovery would demonstrate. *Cf.* Fed. R. Civ. P. 56(f) (requiring a party opposing summary judgment as premature to submit an affidavit specifying what it believes it will discover). In those circumstances, the Court finds no basis for delaying judgment. The Court notes, however, that this ruling does not foreclose further challenges should MSOP fail to enforce the 2007 Policy in a constitutional manner in the future.

### III.  MAGISTRATE JUDGE'S USE OF EVIDENCE

Ivey also objects to the Magistrate Judge's Order on a non-dispositive matter.  In support of its motion for summary judgment, the defendants filed affidavits from two MSOP mental health employees.  Ivey argues that those affidavits should have been stricken because they reveal private health data.  The Magistrate Judge denied this motion, noting that the Federal Rules of Civil Procedure do not provide for motions to strike affidavits in support of motions for summary judgment, and that the affidavits were filed pursuant to a Protective Order.  (*See* Docket No. 79.)  Ivey now objects, arguing that the disclosed materials were subject to a therapist-patient privilege.

"The standard of review applicable to an appeal of a magistrate judge's order on a non-dispositive issue is extremely deferential."  *Reko v. Creative Promotions, Inc.*, 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).  This Court will reverse such an order only if it is clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); Local Rule 72.2(a).  Here, when the Magistrate Judge signed the applicable protective order he gave Ivey nearly three weeks to make any objections.  Ivey failed to do so.  In addition, in filing this action – and challenging restrictions on access to materials that may impact his rehabilitation – Ivey voluntarily placed his mental condition at issue.  *See* Minn. R. Civ. P. 35.03.  In those circumstances, the Magistrate Judge's Order was neither clearly erroneous nor contrary to law.  Accordingly, that Order is affirmed.

### ORDER

Based on the foregoing, all the files, records, and proceedings herein, the Court **OVERRULES** plaintiff's objections [Docket No. 111] and **ADOPTS** the Report and

Recommendation of the Magistrate Judge dated August 18, 2008 [Docket No. 108] and **AFFIRMS** the Magistrate Judge's Order dated August 18, 2008 [Docket No. 109]. Accordingly: **IT IS HEREBY ORDERED** that:

1.   Plaintiff's Notice of Motion and Cross-Motion for Summary Judgment [Docket No. 81] is **DENIED**.

2.   Defendants' Motion for Summary Judgment [Docket No. 82] is **GRANTED**.

3.   The Magistrate Judge's Order dated August 18, 2008 [Docket No. 109] is **AFFIRMED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 30, 2008  
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____  
JOHN R. TUNHEIM  
United States District Judge